For the appellant, Mr. Nester and Mr. Keefe. Mr. Keefe will not be arguing. And for the appellee, Mr. Walsh and Mr. Campos, you've split your time. You may proceed. Mr. Nester, button your shirt and pull your tie up. Mr. O'Keefe, I'm sorry. That's all right. I have to. I'm not really a suit guy, but, you know. Sure, I understand. Proceed. May it please the Court, Counsel, Michael Nester appearing on behalf of St. John's Hospital. As I was driving up to Springfield this morning, I, for some reason, and I have these stray thoughts that entered my mind from time to time, thought of a quote from Ralph Waldo Emerson. And that quote is as follows, assuming that I remember it correctly, a foolish consistency is the hobgoblin of little minds. And I would suggest to the Court that that view of consistency may in literary circles be appropriate. However, that view of consistency in a court of law is inappropriate because consistency and predictability are hallmarks of our judicial system. And with regard to this particular case, the record is replete with inconsistencies which are not minor. They're not insignificant. In fact, they're certainly not foolish. But rather they rise to the level of what I believe, and my client certainly believes, constitute reversible errors such that they are substantive in nature. And respectfully, we request that this Court address those issues, correct those errors, and reverse the decision of the trial judge and remand this case for further proceedings. With regard to the inconsistencies that are replete in the record, they are both procedural and substantive. With regard to the procedural errors or deficiencies, it is obvious from a cursory review of the record that this case began in January of 2013 when my client, St. John's Hospital, filed its complaint for declaratory judgment. Thereafter, two of the defendants, and only two at that point in time, filed motions to dismiss. Those two defendants were National Guardian and ECI. Those two motions to dismiss were briefed, presented to the trial court, argued, and decided by the trial court. And at that time, initially, the trial court deemed the motions to dismiss to be without merit and denied saying. Thereafter, only one of those two defendants, National Guardian, filed a motion to reconsider. ECI did not file anything at that point in time with regard to the prior decision by the court that the motions to dismiss were without merit. Subsequent to that, the other defendants on a seriatim basis filed motions to dismiss some of which raised standing issues, some did not. One defendant, one of the emergency room physicians, Dr. McDaniel, if memory serves, did not even file a motion to dismiss. And so it was in that, those set of circumstances that the trial court scheduled for hearing a oral argument with respect to the motion to reconsider. On that date, when the motion to reconsider was argued or presented to the court, that was the sole issue presented to the court for disposition. And the court thereafter, and in fact, there's a colloquy between the court and counsel with regard to the fact that CIEP, another co-defendant, had filed a motion to dismiss in the interim and counsel suggested that it may be an appropriate time to present oral argument to the court with regard to that motion. And the court indicated that it had not read the motion, and counsel requested some guidance from the court, and the court said simply schedule it for hearing. So there's no doubt from the record that the only motion presented to the court was to dismiss. Counsel, I think there are some serious concerns with this case, but your argument appears to me to not be addressing them, and let me explain why. You're looking at a panel of appellate court judges who cumulatively have well over 30 years' experience as a trial court. We all were there. It seems to me even sua sponte, and I think I did it at least once or twice, as a trial judge, if I have reason to reconsider and think a decision I entered was mistaken, I can, and I should, and I should be permitted to change my mind. That's essentially what happened here with Judge Schmitt, even though once he had occasionally consider one of the motions to dismiss and thought, you know, I should have granted it, there's no reason he can't sua sponte address the others, is there? Judge, I understand your point, and I'm not arguing the proposition that National Guardian was not entitled to file a motion to reconsider, certainly under the law they were. I think, by the way, that the trial judge got it wrong when he reversed himself, but I understand that. He may have, but you seem to be spending a lot of time on the other people, and why did he change his mind when they didn't even file a petition? Because he was the trial judge he decided his motion to dismiss was improperly denied, and he's changed his mind. What's the issue? And Judge, maybe I should have gotten to the point sooner rather than later. The point is, not the issue that you just addressed, but he could change his mind under those circumstances, those procedural circumstances with regard to National Guardian. He could not with regard to the other defendants. ECI did not file a motion to reconsider, and the other defendants, some of whom, as I've indicated, hadn't even filed a response to pleading by that point in time. Why couldn't he change his mind with regard to them? Based upon a motion to reconsider that had never been presented to the court. Wasn't the case still within the bosom of the court, so to speak, using that metaphor? But Judge, he was reconsidering the motion filed by National Guardian. He was not considering the motions to dismiss filed by National Guardian. If there's been a motion to dismiss filed with defendants A, B, and C, and they've all been denied, and I'm the trial judge, I don't even need a motion to reconsider my denial, do I? The case is still before me. I'm the trial judge. I could have had an epiphany in the shower two weeks later and say, you know, I should have granted that motion. That would be rare, but I think the court would probably have the ability to do that. There's no question the court has the authority to do that. But Judge, you're assuming, with regard to that hypothetical motions to dismiss A, B, and C, that the motions are identical in this particular case. No, I'm not assuming any such thing. The point is, he could change his mind. What I'm troubled by in this case is this. If the case, if we were to affirm, and this case goes back to the trial trial trial trial level, looks to me like, as best I can tell, there's some very serious claims being made here and some very serious dollars involved. If a judgment is rendered in favor of the plaintiffs, ultimately the Fugates in this case, who pays? And do we know on this record who's going to have to pay what? And isn't that what you're seeking to find out? Your Honor, the question of who pays is a very, very serious question in this piece of litigation, and you are correct. That is what brings us before the court ultimately. We believe, under the status of the underlying litigation, where the Fugates have not alleged any independent tort with regard to St. John's Hospital. The only claim with regard to St. John's Hospital is one of the parent agency. And Your Honor, we believe that we had in place a sophisticated interrelated program with regard to contractual obligations that protected St. John's Hospital up to a point. We understood that after $3 million was expended by National Guardian, that we might have exposure. But we certainly didn't believe that we had exposure for $1, nor did we believe that we had exposure for three independent physicians examining a patient on three different occasions allegedly committing three separate malpractices with different proximate cause issues. Would this declaratory judgment action that you brought, had it not been dismissed and had been ruled on the merits, would that have answered the question in your judgment that you were seeking to be answered, who pays what if the Fugates prevail? It would have answered the question whether the contractual relationships that we had in place were going to be enforced or not, which meant that each of the physicians had $1 million in coverage for a total of three, rather than $1 million shared among three individual physicians, which reduced it to a situation of having $333,333.33 worth of coverage, rather than $1 million which all of the documents required them to have. Which, counsel, that's the perfect segue into the ripeness issue. I mean, we're talking about indemnification versus duty to defend, correct? That issue was raised by the defendants in the trial court, and the judge mentioned that in his order, and I believe that he even cited the Weber case, if I'm not mistaken in that regard. Yes, Your Honor. And so do you agree that, generally speaking, that you don't get to issues of indemnification until you have resolved issues of liability? I absolutely disagree with that proposition. Okay, and what case law supports your position? We have cited to the court, the Illinois Supreme Court of Murphy v. Urzo, which stands for the proposition that with regard to a court making a determination with regard to indemnification issues between the insurance carrier and the insured, that that should not be done, if the issues in the underlying court claim are substantially similar to the issues in the declaratory judgment action, such that a decision in the declaratory judgment action would have a preclusive effect, i.e., collateral estoppel would apply, and thus adversely affect the court plaintiff in the underlying case. Your Honor, we've made the case, both at the trial level and at the appellate level, that the two cases, that is to say, the underlying Fugate case and the current declaratory judgment action case, are not substantially similar. In fact, I don't even think they're similar. The Fugate case is a medical malpractice case. The question is whether one or more of the defendants in that case breached the standard of care. In the declaratory judgment action, we have essentially a breach of contract case. And I would take the position even further, let's assume hypothetically that the Fugates had never sued St. John's Hospital with regard to the injury that Ms. Fugate sustained. Let's just eliminate that from our calculus, our discussion here this morning. However, St. John's Hospital discovered somehow, someway, that National Guardian was taking the position that rather than having insurance coverage for each of its emergency room physicians who were on duty at St. John's Hospital providing care to the members of this community, rather than have $1 million coverage for each of those physicians, there was going to be a shared limit. And so therefore, the protection that St. John's Hospital thought they had bargained for and received in terms of insurance company was eviscerated. St. John's Hospital at that point in time, in my view, could have filed a complaint for declaratory judgment. And would St. John's Hospital have standing to pursue that? Absolutely, yes, because they were parties to the contract. In addition, the declaratory judgment action statute provides that you don't have to be in privity with the other party. You don't have to be a third-party beneficiary. The language of the statute indicates that anyone interested in the controversy will certainly under those circumstances, St. John's Hospital would satisfy the standing requirement. With regard to ripeness, would it be right? Yes, because St. John's Hospital wants to know whether or not the contractual relationships that it entered into were going to be honored and enforced by the parties. And therefore, it was right because they were entitled to know whether they had $3 million worth of protection or whether they had something less than that, because that imposes a financial burden on them. Let me ask you again. I think I understand, but clarification would be helpful. And I apologize, Your Honor, if I have not been clear. No, no, no, this is a procedurally complicated case. There's no need to apologize. Insurance law is not my strongest suit, Counselor. I'm trying to struggle here. The CliffsNotes version of what this case is about on insurance coverage is what I'm trying to get. That is, according to St. John's, you folks think you have coverage for, and under the policy with the National Guardian, of how much? What do you think you're entitled to coverage here? We believe that each emergency room physician has a minimum of $1 million coverage per occurrence. Per occurrence per physician? Yes. So, if there were, as an example, the Fugates are alleging that various bad things happened in the emergency room, and I guess several different emergency room physicians have been for any of that, wouldn't kick it until first, assuming there are three of them, I think they were sued, $1 million per coverage on each had been exhausted by the insurance company? Yes. And then you would be liable for something in excess of that? Yes. Okay. And you understand their position to say, oh no, it's just $1 million total? Or what? What is your understanding of the insurance company's position? They have taken the position, they being the insurance company, and the other defendants except the emergency room physicians, I now believe, are in agreement with St. John's position that they're entitled and do have $1 million coverage per occurrence. What is the insurance company? They've indicated to us in discovery responses in the underlying lawsuit, that there is a shared limit, meaning that those three physicians do not have $1 million each. They have to share $1 million amongst them. So each of them really, in reality, has a third of $1 million in coverage. That's what they're contending. So we think that we have bargained for and have in existence a $3 million buffer before St. John's was exposed. That's now been reduced to $1 million. So we drop down to a level of $1 million, at which time we now have to spend our own money in terms of indemnifying the plaintiff for the injuries that the Fugates have experienced, which is not what we bargained for and not what the contractual provisions of the various documents indicate is appropriate. Well, the question I'm going to want to ask Mr. Walsh and Mr. Campos, and I'll ask you now, is this. We know from experience that the overwhelming majority of civil cases are settled. We know from experience that even more than the overwhelming majority, probably every civil case, there is settlement discussions and negotiation. So the problem is this. If there is a $2 million uncertainty in insurance coverage in this case, as you've just described it, and I'll want to see if Mr. Walsh and Mr. Campos agree that that's essentially what this issue is, there's a $2 million uncertainty. How are the respective defendants, who don't have to accept any liability to negotiate settlements, I understand how that works, but how are the Al-Sinjans and how are all the other people supposed to negotiate and try to reach a settlement of these medical malpractice claims? And it seems to me if we affirm, I don't know how you can do that. Judge, I think you're prescient because if I may share something that's not in the record, but in the underlying case, a mediation was scheduled and a mediator retained and we spent a day in mediation attempting to settle the case and the defendants in this particular case, not the individual emergency room positions, but the other defendants, National Guard and ECI, CIEP, took the position that I just espoused, that there's only $1 million. And as a result, that served as an impediment to settlement negotiations. My experience is not in insurance law, but it's in criminal law and it seems to me we're in a situation where we were in a plea bargaining situation and the defense attorney turns to his client and says, you're charged with a series of offense, the state's offered you seven years, I think you should take it. What if I don't? What is the most I can face and what might the judge give me? And the answer is, I don't know what you might face and I don't know what the judge might give you, but let's negotiate this case anyway. I'm real troubled by that posture. I don't think it's a feasible one and it seems to me that that's the position St. John's is in right now and I'm anxious to hear what the appellees have to say about that. I believe my time has expired, but if I may just say, there are two cases, the Illinois State Medical v. Sechon case, I think I'm pronouncing that correctly, C-I-C-H-O-N, and the case of Home Insurance Company v. Hooper. They stand for the proposition that in circumstances, I believe substantially similar to what we're appropriate and it permitted the court to render a decision despite the allegation that the issues were not right for decision. Thank you. We'll hear from you on rebuttal. May it please the court. My name is Michael Walsh. I represent National Guardian Risk Retention Group. That's the insurance company in this particular case. They have a contract of insurance with a company called Central Illinois Emergency Physicians LLP. Central Illinois Emergency Physicians contracted with National Guardian for insurance. They're the named insured in a policy of insurance that is one of the issues in this particular case. What has happened here is that we filed a motion to dismiss before Judge Schmidt. The motion to dismiss was based on a host of different issues, including rightness, because there was no actual controversy involved in this particular case. Mr. Nestor filed his complaint for declaratory judgment based on a host of different requests. They included, I want to know indemnification. I want to sue the doctors for breach of contract of their staff privileges. I want a finding of all these obligations and responsibilities. Judge Schmidt initially denied our motion. And then he realized, as a good trial judge would, based on case law and the facts of the case, that this case is not ripe for adjudication. Under Section 2701 of declaratory judgment, it states, and I quote, declaratory judgment is favored by courts on issues of policy coverage, especially when based on denial of coverage. It's a coverage question. That's what declaratory judgments are. There is not an issue of coverage in this particular case. National Guardian Risk Retention Group provided counsel for each one of the additional sherds under the policy of insurance, Dr. Banday, Dr. McDaniel, and Dr. Byrne. They provided attorneys. They have an expert who is defending those three individual physicians based upon three of the additional sherds. In the course of, I think, eight or nine days, which then leads to the question of what occurrence is if we ever got that file. Under the law in the state of Illinois, occurrence, as outlined in the policy of insurance, doesn't matter how many times you come into the emergency department in a set number of days if it's the same ailment. The contract of insurance is $1 million per occurrence, $3 million in the aggregate. It is a shared policy limit of liability. It doesn't mean that each one of the emergency room physicians has $333,000, as Mr. Nestor would indicate. That's not what it means. It's $1 million per occurrence. It's $1 million. Now, what Mr. Nestor doesn't mention, and it's clearly clear in the records, if you get litigation as a medical malpractice case, before you representing National Guardian, I'm not in that case. I'm not a party to the case. There are three emergency room physicians who worked through CIEP, who saw a Mississugan, technically maybe even two, maybe not even a third saw Dr. Byrne, there's a big question there. There are 11 other defendants in that litigation. There are 14 defendants in this medical malpractice case that is currently going on in Mayacobin County. Fourteen. Mr. Nestor mentioned settlement discussions. He also should mention, based upon what has recently transpired, he has a pending motion for summary judgment in the underlying lawsuit, which makes this entire thing moot and a waste of this court's time. He's clearly asking for an advisory opinion if he's successful in his motion for summary judgment. He also doesn't mention- What about my question, counsel, and that is all civil cases, especially medical malpractice cases, are subject to discussion for possible settlement. Absolutely, Your Honor. And it seems to me one of the difficulties, as you're talking about settlement, is the question of, in the absence of a settlement, what do I have to pay? What's my liability? In the absence of a settlement? Yes. That is, if a case goes to trial and the Fugates get a judgment of X dollars, $3 million, who knows? This sounds serious. How much of that is what St. John's, how much of any of it might be subject to St. John's or any of the other people? You have no idea. And the reason being, Judge- Then how do you negotiate a settlement if you have no idea? But here's the reason. There are 14 defendants, Your Honor. A jury is going to decide if someone's liable or not. There are a number of physicians that saw this patient before she came into the ER. What happens if a jury hits that particular individual, who has nothing to do with National Guardian's policy? What happens if they hit one doctor, the emergency room physician who saw this particular patient, but not the other two? A million dollars. There it is. There's no dispute. It's a million. Second, what plaintiff's counsel is asking for here is an advisory opinion on indemnification. If we're going to go down that road in medical malpractice cases, then every single plaintiff's attorney, who actually may have standing because he's a court claimant, would file declaratory judgment actions and their medical malpractice actions in every single case, because I want to find out indemnification for everybody. They know the position that we have taken. They know the case law. They know what one million per occurrence, three million in the aggregate, means. Plaintiff's looking for more because, oddly enough, litigation leads to very strange bedfellows. Here's St. John's Hospital working with plaintiff's counsel in the underlying Fugate litigation. They're together in this litigation, they're obviously against each other in the underlying litigation, and I assume plaintiff's counsel in the underlying litigation is going to file a tremendous brief in opposition of Mr. Nestor's summary judgment motion. He also has vehicles to protect himself in the trial court. Indemnification actions, cross-claims, where we won't even get into the appeals on these. We won't even get into the accomplishments. What about Mr. Nestor's claim that had the Fugates never sued, and they discovered for some reason that these contracts didn't seem to be adequate or complete or what they envisioned, that they could have sought a declaratory judgment on that basis? I would say it depends on the contract he's talking about. You'd say what? It would depend, Your Honor, on the contract he's talking about. Because the contract that you are a party to, certainly you have standing to raise the case law is clear on who has standing in response to a declaratory judgment action. We all know this, the parties to the contract and intended third-party beneficiaries to the contract. With respect to the insurance policy in this particular case, National Guardian has a standing because they're a party to the contract, it's an agreement. Central Illinois Emergency Physicians has standing, they're a party to the case, to the contract. The additional insurers, including the emergency room physicians, have standing as well. That's where it ends. St. John's Hospital is not referenced in the contract in any way, shape, or form. Under Illinois law, they may be considered an incidental third-party beneficiary because some money is being thrown out, but that's it. Is that enough to pursue a declaratory judgment action? Absolutely not. It is not. Weber, the case touches upon that. You need to have an actual controversy and they don't have it yet. Now, that's not to say that this lawsuit can't be brought later if they think they have standing with respect to contracts. Later under what circumstances? The case goes awry. The case goes where? Awry. It goes bad. There's a big, huge verdict. St. John's takes over the $1 million, the ER docs are all hit, St. John's pays money, they can turn around and say, indemnify us. They can sue the emergency room physicians, the emergency room physicians can subrogate their rights over to St. John's or plaintiff's counsel and come over to the insurance company and say, your policy says really $1 million per doctor per occurrence as opposed to $1 million per occurrence. There's a remedy there. But right now, the courts are being asked to provide advisory opinions on something that has not happened. The issue here is, is there a controversy? The answer is no. Coverage has been afforded. This isn't a right to get indemnification. The other issue is the standing that we've talked about. They're not third-party beneficiaries. They're not intended on that particular contract. And as a consequence, they have no standing to bring the lawsuit, and the lawsuit isn't ripe. Counsel, you say the lawsuit isn't ripe, and I just want to ask you about the Murphy case. In my reading, the Murphy case doesn't create some type of exception to the general notion that, you know, you're not looking at liability yet, so it's not ripe. It seems to be an exception to the Staple rule, and, of course, that case involves a totally different factual scenario than what we have here. What are your thoughts on that? Your Honor, as we've outlined, and I'm sorry, I'm out of time, but may I answer? Continue. You're absolutely right. And if you've reviewed the briefs in this case, which you clearly have, we've talked about the Urso case, and it has nothing whatsoever to do with this. As a matter of fact, there was a judgment that was rendered, a default judgment, that then triggered that. So the judgment's the key. There isn't a judgment in this particular case. There's 14 defendants in the underlying Fugit litigation. We don't know what's going to happen yet. And asking this Court for advisory opinions on something that might not come to fruition is a waste of this Court's time and Judge Schmidt's time. And that's the reason why, when he reconsidered what was going on, he said, you know what? There is no standing here. The hospital isn't a third-party beneficiary. And this isn't even ripe. We're not even here yet. Once it becomes ripe, the right party can file something. And it could very well be Mr. Keefe, because tort claimants can do that. They're intended third-party beneficiaries. But St. John's isn't. Thank you very much for your time. Thank you. Thank you. May it please the Court, counsel. My name is Alex Campos, and I represent two of the defendants involved in this declared tort act. You have to speak up a little louder. I apologize, Your Honor. That mic's not really going to help you. Well, then I'll have to speak up. It's not an amplification. It's my first time down here, so I'll give it a better try. I represent two of the defendants, ECI and CIEP, who are involved in this declaratory judgment action. As the Court knows, this case was dismissed by Judge Schmidt a few months back, and I'm here to explain to you why those rulings should be affirmed with respect to those two defendants on the issue of standing and on the issue of ripeness. Counsel, or excuse me, Your Honor, properly noted that judges can make decisions sua sante. As our brief notes, the Coughlin case reflects that an appeals court can affirm for anything that's in the record. In this case, it's undisputed that ECI and CIEP joined in the National Guardian's motion to dismiss. That order is reflected on May 10, 2013. And then when we had the motion for reconsideration hearing back in January of 2014, I made arguments on behalf of both of those two defendants reiterating the points of standing and ripeness that were raised on the motion reconsidered by the insurance company. So to the extent that there's a question as to whether ECI or CIEP has properly maintained those defenses to this case, I don't think that that should be something that should worry this Court. If you'll allow me, I'd like to take each of them separately, because I think that is probably the way that makes the most sense. ECI is alleged to be the agent of National Guardian for purposes of providing indemnification to the doctors in this case. As the Court may be aware, ECI filed a motion to dismiss, and the basis of that motion was the fact that a reading of the policy provides no basis to conclude that ECI has any obligations to pay any monies for anyone in this case. They are there simply to accept notice of suit on behalf of the insurance company. That being said, to the extent that the Court finds that National Guardian is right and that there's no standing with respect to that policy, and the Court finds that National Guardian is correct that this matter is not right, there is no reason why those decisions should not apply with equal force to ECI. And the reason being is that ECI is similarly situated as National Guardian for purposes of the allegations, and any inconsistency with respect to ruling for National Guardian in one manner and ECI in another manner just doesn't make any sense. Moreover, noting the Coughlin case that this Court has the ability to affirm for any reason in the record, I think a clear reading of the insurance policy demonstrates that there is simply no basis to conclude that ECI has any duty to provide any indemnification whatsoever in this case. With respect to CIEP, this is the physician's group that contracted with the insurance company to obtain medical malpractice coverage for its respective physicians. CIEP and National Guardian are the parties to that contract. I've looked that contract over. I don't see St. John's Hospital anywhere in that contract. I don't see any reference to hospital generally in that contract. So to the extent that the hospital makes arguments that we must consider all of these contracts together, I think that's just factually incorrect. What we have to do is look at the contract at issue, and that's the policy. And unless there is any ambiguity with respect to the terms of the policy, this Court and any Court has no reason to look beyond the four corners of the document. We've been here for a long time in this case, and to date there has never been any reference to any ambiguity in the insurance policy. The hospitals have many opportunities to demonstrate what's at issue. What about Mr. Nestor's claim that the distinction is whether it's $1 million per or $1 million for the three physicians? I understand that that's a question that he thinks is ambiguous, but the question isn't what the terms of the contract are ambiguous. It's what term in the contract could be deemed to provide the hospital with any standing to argue about the contract. So there needs to be some ambiguity that may be deemed to consider the hospital as someone who is either A, a part of the contract, and we know that's not the case, or B, some term, some provision that allows it to have standing as an intended third-party beneficiary. So to the extent that there are ambiguous terms in the policy itself is a red herring. The issue that this Court should be looking at is what term in this policy could possibly be read to give the hospital any type of standing to ask for an adjudication of the policy. And quite frankly, Your Honors, there's just nothing there. With regards to the ripeness issue for CIEPI, I think it's pretty fair to say that this issue is two levels removed before being right. As the Court knows, the hospital is asking that the Court declare that CIEPI is in breach of the contract that the physicians group has with the hospital. And according to the hospital, that requires that the physicians group have physicians who each have a million dollars in coverage per physician. We don't have to get to that issue yet. That is not right on two levels. First of all, we need a judgment in the Fugate case. For example, as counsel has noted, there is one motion for summary judgment pending by one of the physicians. So to the extent that that physician is out, now we're down to two physicians. Let's say that one of those physicians is found liable and one of them is not. We have a situation where one physician has been found liable and there will be one million dollars in coverage, and that is exactly what the hospital requests. Similarly, because we don't know how the case is going, because we don't know how juries are, there is a possibility that the total judgment in this case can come in at less than a million dollars. In that situation, again, there's not going to be any issue. A million dollars will be provided by National Guardian. That will satisfy all of CIEP's contractual obligations. So that's the first level. The second level is that any interpretation of the contract that says that CIEP breached the contract is necessarily predicated on a finding in terms of what the policy itself says. If this court, or whatever judgment court, whatever court comes to the conclusion that the policy actually says a million dollars per physician, then there is no breach. CIEP will have satisfied its contractual obligations for the hospital and we can all go home. That case isn't right, and until that case becomes right, the issue with regards to whether CIEP has breached the contract is not right. To the extent that the hospital is asking for a determination that CIEP has breached the agreement by not providing $3 million in coverage, I think that is not at this time appropriate in light of the fact that it may never be appropriate because there may never be a reason to have $3 million needed for coverage if that doesn't ever happen for a jury verdict. Similarly, there may never be three doctors who are found liable, and such triggering that $1 million per that the hospital requests. To the extent that counsel has a hospital, judges have any questions? I see no questions. Thank you. I want to make sure that on the record that I'm clear because of the remarks that were made by counsel representing National Guardian and ECI and CIEP. They've taken the position before the trial court and this court that whenever there is a question with regard to an insurance policy and in particular the indemnification provision in that policy, including the obligation to defend, I'm just focusing on indemnification. If there's ever an issue of that nature, every underlying court case that's filed must be tried to verdict. Those cases can never be settled. That's the position that they've staked out in this particular case. And the reason is because we don't know. We don't know what the value of the case is. We don't know whether the defendants will be found guilty. We don't know whether some will be found guilty and some will be exonerated. We don't know the dollar amount of the verdict. We don't know the contributory negligence of the plaintiff perhaps. That means there's a guarantee that every time there's a discussion or debate with regard to the indemnification provision in an insurance policy, those cases must be tried. That's the position that counsel for defense has staked out here today, which I think is absurd and patently wrong. In addition, even if that would be deemed by the court to have some merit, that proposition, I want the court to understand my client's position. We're here. There's no doubt that the Fugate case brings us here. There's absolutely no doubt about that. But there may be other cases that have been filed or that have yet to be filed involving malpractice claims arising out of emergency room care at St. John's Hospital, and this very issue may arise again. We want a declaration that our view of the world is correct, our view as represented by at least four or five distinct contractual promises that each of the emergency room physicians has $1 million in coverage. That's what we bargained for. That's what we negotiated. That's what the executed contracts provide. And we believe that we're entitled to know that because it's concrete that this is not advisory. This is not hypothetical. This is not theoretical, as defense counsel suggests. This is a concrete problem that the hospital is grappling with in the Fugate case and perhaps in future cases. And by the way, the policies that are at issue with regard to St. John's for this particular period are not claims-made policies. They're occurrence policies. So if an event occurred two months ago or two years ago when those emergency room physicians were present, then that coverage is triggered. I don't think there's any doubt that St. John's has standing. I don't think there's any doubt that this case is ripe for adjudication. And in addition, one point that I failed to make earlier in my statement to the court, that is with regard to the third-party beneficiary claim, we have claimed that St. John's is a third-party beneficiary of the insurance policy. And I would suggest to the court that in our briefs we've established that one, in terms of the well-pleaded facts of the complaint, that stands as true. And two, whether an entity or a person is a third-party beneficiary of the contract is a fact-specific inquiry based upon the contract itself and the surrounding circumstances of the contract in terms of its negotiation and execution. So if anything is premature, it was premature for the trial judge to rule that St. John's Hospital was not a third-party beneficiary under these circumstances at the motion-to-dismiss stage. Anything further that I can answer? See no questions. Thank you. Thank you. We'll take the matter under advisement and await the readiness of the next case.